ORDERED.

**Dated:  December 01, 2021**

_____

Lori V. Vaughan
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:                                                          Case No. 3:21-bk-00707-LVV
                                                                Chapter 11

Donald J. Schroeder, and
Deirdre C. Schroeder,

                    Debtors.
_____/

## <u>MEMORANDUM OPINION</u>

The parties' dispute centers on a right of first refusal on an oceanfront home located in Fernandina Beach, Florida.  The home is Debtors' homestead. Debtors propose to sell the homestead to the highest bidder and use a portion of the proceeds to fund their plan.  Omni Amelia Island, LLC ("Omni") contends that the Debtors' filed their case in bad faith solely to avoid Omni's right of first refusal which was exercised prepetition and which resulted in litigation. Omni argues that the Court should reject Debtors' plan and grant stay relief for a variety of reasons including Debtors' alleged bad faith.

The disputes were brought before the Court for a trial on November 1, 2021 to consider: (i)

the Debtors' Combined Amended Disclosure Statement and Chapter 11 Plan of Reorganization (Doc. 89); (ii) the Debtors' Motion Authorizing Sale of Real Property Free and Clear of Liens (Doc. 16); (iii) the Debtors' Motion to Reject Omni's Disputed Right of First Refusal and to Establish a Bar Date for any Rejection Damage Claims (Doc. 32); and (iv) Omni's Alternative Motion for Relief from the Automatic Stay based on Bad Faith Filing (Doc. 101). As discussed below, the Court finds that the plan was not filed in bad faith and will confirm Debtors' plan over Omni's objections.

## Background Facts

### The Prepetition Auction

The Debtors own real property at 27 Ocean Club Drive, Fernandina Beach, Florida (the "Property"). The Property is scheduled as exempt homestead Property under Article X, section 4, of the Florida Constitution and Florida Statutes §§ 222.01 and 222.02. (Doc. 1, p. 22). Based on an appraisal dated April 19, 2021, the Debtors and Omni stipulate that the market value of the Property is $9,700,000.00. (Debtors' Ex. 3).

Prepetition, the Debtors entered into an Auction Marketing Agreement ("AMA") for the Property with Concierge Auctions, LLC ("Concierge"). (Omni's Ex. 1). The AMA provided that the Property would be sold at an auction conducted by Concierge without reserve. *Id.* At the insistence of Mr. Schroeder, the listing price on the Property was set at $12,500,000.00. The highest pre-auction bid, however, was submitted in the amount of only $3,500,000.00. At the auction, the highest bid received was the pre-auction bid of $3,500,000.00 by Donald W. Beam and Carla C. Beam (the "Beams"). After the Debtors and the Beams entered into a sales contract, Omni notified the parties of its intent to exercise its right of first refusal ("ROFR") "at the same purchase price and on the same terms" contained in the sales contract.[1] (Omni's Exs. 3, 5).

---

[1] The language giving rise Omni's ROFR is located in the Supplementary Restated Declaration of Class A Covenants and Restrictions for Amelia Island Plantation, Nassau County, Florida (Ocean Club Drive) recorded in Official

For various reasons, the Debtors objected to the auction process employed by Concierge and the resulting contract. Before the scheduled closing date of April 30, 2018, the Debtors advised Omni that they would not close.  In response, Omni filed a state court action for breach of the sales contract and for specific performance against the Debtors in the Circuit Court of the Fourth Judicial Circuit in and for Nassau County, Florida (the "State Court Action").  Omni also recorded a Notice of Lis Pendens on April 27, 2018, at Official Records Book 2192, Pages 1441 *et seq.* of the public records of Nassau County, Florida.  (Omni's Ex. 22).  Contentious litigation ensued and matters were still pending in the State Court Action when the Debtors filed their petition.

**Debtors' Bankruptcy**

On March 25, 2021, the Debtors filed a voluntary petition for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code.  After Omni and the U.S. Trustee objected to the Subchapter V election, Debtors filed an amended petition to remove the Subchapter V election (Doc. 68) and the case proceeded as a traditional chapter 11.

On April 1, 2021, the Debtors moved for Order (I) Authorizing Sale of Real Property Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (f); (II) Establishing Bidding Procedures and Auction Sale Process; (III) Scheduling Auction and Sale Hearing to Consider Final Approval of Sale; and (IV) Granting Related Relief (the "Motion to Sell"). (Omni's Ex. 13).  Omni objected to the Motion to Sell on the basis that the Debtors are under contract to sell the Property to Omni, and because the exempt homestead Property is not property of the estate subject to sale under 11 U.S.C. § 363.  (Doc. 36).

On May 4, 2021, the Debtors' filed a Motion (I) for Authority to Reject Omni's Disputed

---

Records Book 848, starting at page 1642 of the public records for Nassau County, Florida. On April 12, 2018, Omni delivered the deposit due under the Sales Contract of $420,000.00 to the escrow agent.  On April 16, 2018, Omni recorded a Notice of Option to Purchase in Official Records Book 2190, pages 196-197, of the public records of Nassau County, Florida a Notice of Option to Purchase.  (Omni's Ex. 5).

Right of First Refusal and (II) to Establish a Bar Date for any Rejection Damage Claims (the "Motion to Reject").  (Doc. 32).  In the Motion to Reject, the Debtors maintain that Omni's purported ROFR may be rejected as an executory option contract under 11 U.S.C. § 365.

In conjunction with the Motion to Sell and Motion to Reject, the Debtors sought court approval to employ a broker for the marketing and sale of the Property.  (Doc. 16).  The Court subsequently authorized the request and entered an order permitting the Debtors to contract with Berkshire Hathaway HomeServices, Kassandria Brown and Hugh Williams (the "Broker").  (Doc. 43).

**Debtors' Plan of Reorganization**

On June 22, 2021, the Debtors filed their Disclosure Statement and Chapter 11 Plan of Reorganization (Doc. 60), which was amended on August 3, 2021 (Doc. 89) (the "Initial Plan").  The Initial Plan provides that the Property will be sold through an auction process and the proceeds used, in part, to fund payments to creditors. (Doc. 89, pgs. 12, 13).  Subsequently, the Broker secured a contract for the sale of the Property to an Initial Contract Purchaser for $5,000,000.00 cash on an "as is" basis (the "Initial Contract"), with the sale being subject to approval by the Court.  (Doc. 170).

Shortly before trial, the Debtors filed a Housekeeping Combined Amended Disclosure Statement and Chapter 11 Plan of Reorganization (the "Plan").  (Doc. 127).  The Plan differs from the Initial Plan only in the treatment of two classes of creditors with whom the Debtors reached an agreement.[2]

Under the Plan, creditors are classified as follows:

> Class 1: Secured Claim of Regions Bank.
> Class 2: Secured Claim of the Nassau County Tax Collector.
> Class 3: Claim of Berger Singerman LLP

---

[2] The red-line Plan also reflects changes to Class 7, but these changes appear to be corrections to the Debtors' calculations and not substantive changes in the treatment of Class 7.  (Doc. 127, pg. 14).

Class 4:  Claim of Donald and Carla Beam

Class 5: Secured Claim of David Walker.

Class 6: Claim of Omni Amelia Island, LLC

Class 7: General Unsecured Claims.

(Doc. 127, pg. 6).   All classes are impaired except for Class 1 (Regions Bank) and Class 2 (Nassau County Tax Collector), which are both unimpaired.[3]

The Plan reflects the settlement agreements reached with Berger Singerman and the Beams by which their claims would be treated as partially secured and partially unsecured.  (Doc. 127, pgs. 12, 13).  Berger Singerman filed a secured proof of claim for $299,129.48 in unpaid attorney's fees related to the State Court Action relying on a charging lien provided for in their engagement agreement. (Debtor's Ex. 4).  Under the Plan, Berger Singerman will be paid $100,000.00 out of the sale with the balance paid pro rata with unsecured claims in Class 7.  (Doc. 127, pg. 12).

The Beams filed a secured claim for $1,105,000.00 based on a mortgage the Debtors granted the Beams in a prepetition settlement agreement.[4]  (Debtor's Ex. 4).  The Plan proposes to pay the Beams $250,000.00 out of the sale of the Property (or $500,000.00 if the sale closes for $5,500,000.00 or more) with the balance paid pro rata as an unsecured claim in Class 7.  (Doc. 127, pg. 13). Omni filed a secured claim based on the ROFR, but its claim is treated as a general unsecured claim paid pro rata with Class 7 because of this Court's Order Sustaining Objection to Secured Status. (Doc. 117).

---

[3] Regions Bank ("Regions") holds first and second mortgages on the Property and filed secured proofs of claim in the total amount of approximately $3,272,119.50.  (Debtor's Ex. 4).  The Nassau County Tax Collector is owed property taxes on the Property in the amount of $49,899.72 from 2020, and $43,061.20 from 2021.

[4] The post-petition dispute concerned whether one of the two contingency events in the pre-petition settlement agreement either had or would be satisfied, which would result in the mortgage and note becoming unconditionally due and payable.

Payment to Class 7 general unsecured creditors will depend on the results of the auction. Creditors will receive a minimum distribution of $100,000.00. (Doc. 89, pg. 11). Further, for each $500,000.00 increase in the sales price of the Property above $4,000,000.00, the Plan will distribute an additional $50,000.00 to unsecured creditors. *Id.* If the Property is sold at the Initial Contract price of $5,000,000.00, the holders of allowed unsecured claims will receive a pro rata distribution of $200,000.00 under the Plan. The following chart illustrates the potential recoveries for general unsecured creditors:

| Home Sales Price | Amount Paid to Unsecured Creditors |
|---|---|
| $5 million | $200,000.00 |
| $6 million | $300,000.00 |
| $7 million | $400,000.00 |
| $8 million | $500,000.00 |
| $9 million | $600,000.00 |

(Doc. 110, pg. 6).

Debtors' creditors, except for Omni and Amelia Island Plantation Real Estate Services, LLC ("AIPRE") support the proposed Plan.[5] Omni objects to the approval of the Disclosure Statement and Confirmation of Debtors' Plan on the basis that the Plan fails to satisfy the requirements under 11 U.S.C. § 1129 and should be dismissed as a bad faith filing. (Docs. 126, 135, 169). Omni also maintains that the Property is not subject to sale under 11 U.S.C. § 363, and that if the ROFR is rejected under 11 U.S.C. § 365 Omni will acquire a constructive trust over the sale proceeds.

**Trial on Confirmation of the Plan, Stay Relief, and Related Matters**

On September 1, 2021, Omni filed a Motion for Order Confirming Absence or Termination of the Automatic Stay, or, in the Alternative, for Relief from Stay (the "Stay Relief Motion") based

---

[5] Regions did not initially vote in favor of the Plan. However, Regions subsequently withdrew its vote against the Plan based on a stipulation reached with the Debtors. (Doc. 147). In the stipulation, the Debtors clarified that Regions' claims will be paid with accrued post-petition interest, as well as post-petition fees and costs. (Doc. 147).

on allegations that the Debtors filed the case in bad faith. After a hearing on September 28, 2021, the Court denied Omni's request and reserved the remaining question of the Debtors' alleged bad faith for trial along with confirmation.  (Doc. No. 117).

On November 1, 2021, the Court held a one-day trial on confirmation of the Debtors' Plan, and Omni's Stay Relief Motion together with all of the pending related issues and contested matters. At the trial, the Debtor presented two witnesses: David Schroeder and Kassandria Brown, a real estate agent with Berkshire Hathaway.  Omni presented no witnesses.  The parties further stipulated to several facts in connection with the trial.  (Doc. 165).

## **Legal Analysis**

### I    **Debtors' Right to Reject Omni's Purported Right of First Refusal as an Executory Contract under 11 U.S.C. § 365**

The Debtors seek to reject Omni's ROFR[6] under § 365 as an executory contract. Section 365(a) provides:

> Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

"A primary purpose of the statute is to allow for the assumption of contracts that are beneficial to the estate, and the rejection of contracts that are burdensome to the estate." *In re Laudenslager*, No. 3:12-BK-2186-PMG, 2014 WL 6544285, at *2–3 (Bankr. M.D. Fla. Nov. 19, 2014).   An executory contract is generally a contract in which performance remains due from both parties. *Id.* at *2; *see also In re Wells*, 227 B.R. 553, 564 (Bankr. M.D. Fla. 1998).  As long as performance remains due, contracts by a debtor to sell real property are typically treated in bankruptcy cases as executory

---

[6] Debtors contend that the ROFR is not valid or enforceable for a variety of reasons. Omni contends that the validity and enforceability of the ROFR was decided in the State Court Action. The Court will not address the validity or enforceability of the ROFR as it is being rejected.

contracts. "A land sale contract is executory when the Debtor has not yet conveyed or been ordered to convey title." *In re Elkowni*, 318 B.R. 605, 608 (Bankr. M.D. Fla. 2004); *see also In re General Development Corp.*, 84 F.3d 1364, 1371 (11th Cir. 1996) (noting that where the debtor is the seller of real estate, the courts have found the contract to be an executory one.). "The operative date for determining whether a contract is executory or non-executory is the petition date." *In re Fieldstone Mortgage Co.*, 427 B.R. 364, 373 (Bankr. D. Md. 2010). As stated by the court in *Elkowni*,

> The Option contract is an executory contract. An executory contract is any contract where both parties have unperformed obligations that would constitute a material breach if not performed. Option contracts linking debtors to the role of sellers of real estate are executory. A land sale contract is executory when the Debtor has not yet conveyed or been ordered to convey title. An option to purchase real estate, given to a prospective purchaser pre-petition, is an executory contract which the debtor may reject pursuant to § 365. The debtor has the continuing obligation to forebear from revoking the offer to sell and the prospective purchaser has the unperformed obligation of tendering payment.

*In re Elkowni*, 318 B.R. 605, 608 (Bankr. M.D. Fla. 2004).

Most courts have held that a right of first refusal is similar to an option to sell real property and is an executory contract subject to rejection under § 365. *In re Kellstrom Indus., Inc.*, 286 B.R. 833, 834 (Bankr. D. Del. 2002*); see e.g.; In re Waldron*, 36 B.R. 633, 636–37 (Bankr. S.D. Fla. 1984), rev'd on other grounds, 785 F.2d 936 (11th Cir. 1986) (option contract was an executory contract which could be rejected under section 365); *In re Coordinated Financial Planning Corp.*, 65 B.R. 711, 713 (9th Cir. BAP 1986) (although the right of first refusal was a covenant running with the land, the court found it was an executory contract which could be rejected under section 365).

Omni concedes that the Debtors have the ability under § 365 to reject the ROFR as an executory contract. Where the parties diverge is the impact that rejection will have on the Debtors' estate. Section 365(g)(1) provides that rejection of an executory contract (that was not previously assumed) results in a breach of the contract as of the day before the petition date. It is axiomatic then

that a claim resulting from rejection is a prepetition claim.  Following on from this proposition, Omni

makes the novel argument that this prepetition breach of the ROFR results in a constructive trust for

the difference between the contract sales price and the price the Debtors obtain from the bankruptcy

sale.  In support, Omni cites to *Coppola Enterprises, Inc. v. Alfone*, 531 So. 2d 334, 335 (Fla. 1988)

where the Florida Supreme Court held,

> [W]here a vendor is unable to perform a prior contract for the sale of the lands
> because of a subsequent sale of the same land, he should be held, to the extent of
> any profit in the subsequent sale, to be a trustee for the prior vendee and accountable
> to such vendee for any profit.

*Coppola*, 531 So. 2d at 335[7] (citing to *Gassner v. Lockett*, 101 So. 2d 33, 34 (Fla.1958)); *see also*,

*Schachter v. Krzynowek*, 958 So. 2d 1061, 1064 (Fla. Dist. Ct. App. 2007); and *In re TOUSA, Inc.*,

503 B.R. 499, 501 (Bankr. S.D. Fla. 2014).  Omni contends if the ROFR is rejected, the resulting

constructive trust makes Debtors' business judgment unreasonable and craters Debtors' Plan because

the sale proceeds will no longer be available to fund its distributions.

The Court rejects Omni's last-minute "hail mary."[8]  Rejection of an executory contract results

in a prepetition, unsecured claim against the estate.  Under § 502(g) a claim resulting from rejection

of an executory contract shall be allowed or disallowed the same as if such claim arose before the

petition date.  *See Laudenslager*, 2014 WL 6544285, at *6 ("Under § 365(g) and § 502(g) of the

---

[7] The Court notes that even though the Florida Supreme Court uses the word "trust" it did not impose a constructive trust, but instead affirmed an award of damages equal to the difference between the contract and subsequent sale price. *Coppola*, 531 So.2d at 336.  The same is true in the *Schachter* case.  *Schachter*, 958 So. 2d at 1065. Indeed, the Court could not locate a case where the court imposed a constructive trust relying on *Coppola*, even though some courts have interpreted *Coppola's* language as imposing a constructive trust in the right circumstances. *See TOUSA*, 503 B.R. at 506 (distinguishing the case from *Coppola* and its progeny); *In re 929485 Florida, Inc*., 2021 WL 1556133 (Bankr. M.D. Fla. 2021) (same).

[8] Omni makes this argument for the first time in its Trial Brief filed three days prior to the trial. Notably, Omni does not mention this argument in response to the Motion to Reject or Motion to Sell, in its Proof of Claim, or even in the Objection to Confirmation where the *Coppola* case is first cited. Objections to confirmation of Debtors' Plan were due seven days prior to the Confirmation Hearing. (Doc. 94).  The objection, therefore, was not timely made.  As the Court rejects Omni's constructive trust argument based on substantive deficiencies, the Court will not engage in a discussion as to whether the objection should be deemed waived for being untimely. However, the Court cautions parties appearing before the Court to raise substantive arguments in a timely manner.

Bankruptcy Code, the rejection operates as a breach of the Contract immediately before the filing of the bankruptcy petition, and the claim based on the breach is treated in the bankruptcy case as if it had arisen before the petition was filed."); *In re Stewart Foods, Inc.*, 64 F. 3d 141, 144 (4th Cir. 1995) ("The rejection of an executory contract constitutes a breach of the contract, and a party's damages resulting from that rejection are treated as a pre-petition claim and receive the priority provided to general unsecured creditors."); *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) ("Damages on the contract that result from the rejection of an executory contract, as noted, must be administered through bankruptcy and receive the priority provided general unsecured creditors.").

The term "claim" is defined in § 101(5) as a "right to payment whether or not such right is … equitable, secured or unsecured" or the "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment…."[9]  A constructive trust is an equitable remedy designed to restore property to its rightful owner. *In re Cameron*, 359 B.R. 818, 822 (Bankr. M.D. Fla. 2006).  To the extent *Coppola* provides for the imposition of a constructive trust, it is a trust over the sale proceeds for payment of a specific amount – fitting the § 101(5) definition of a claim as including "a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." Accordingly, even if Omni obtains the right to an equitable remedy of a constructive trust resulting from the rejection, such right is simply a prepetition, unsecured claim subject to discharge in Debtors' bankruptcy.  *See In re Spoverlook*, LLC, 560 B.R. 358, 364 (Bankr. D.N.M. 2016) (HOA's claim for specific performance resulting from breach of settlement agreement

---

[9] The definition is drafted broadly to allow, "all legal obligations of the debtor, no matter how remote or contingent, [would] be able to be dealt with in the bankruptcy case...." *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.),* 209 F.3d 125, 128 (2d Cir. 2000) (*quoting United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1003 (2d Cir. 1991)).

converts to a prepetition claim for money damages on rejection in bankruptcy); *In re Alongi,* 272 B.R. 148, 153-154 (Bankr. D. Md. 2001) (rejection is designed to preclude specific performance rights and to instead give rise to a prepetition claim); *In re Lavigne*, 114 F.3d 379, 389 (2d Cir. 1997) ("Section 365(g) provides the means for determining the priority of the non-debtor's claim. When a contract is rejected, the breach claim is treated as a pre-petition unsecured claim.").

In any event, the *Coppola* decision is easily distinguishable.  In *Coppola*, a non-bankruptcy case, the seller breached the contract by selling the property to another buyer.  *Coppola*, 531 So.2d at 336.  The court reasoned that because the right of specific performance was no longer available, as the debtor no longer owned the property, the buyer would be provided a claim for the difference in the purchase price.[10]  *Id.*  The circumstances in this case are vastly different.  The Debtors did not enter into a contract to sell the Property to Omni.  The contract that Omni references is one imposed by law.  Moreover, the Debtors have not sold the Property.  The right of specific performance is unavailable to Omni because the Debtors filed for bankruptcy, not because the Property was sold. And the Debtors' breach is not the result of a sale to another buyer.  The breach here is by reason of the rejection entitling Omni to simple rejection damages, nothing more.

The court in *TOUSA* recognized these distinctions and found that rejection did not give rise to the equitable remedy of a constructive trust.  *TOUSA*, 503 B.R. at 504.  In *TOUSA*, the contract limited the buyer to a claim for specific performance upon breach.  *Id.* at 503-504.  The issue was whether the buyer had a rejection damages claim considering the limitation on remedies in the contract.  Under 11 U.S.C. § 502(c)(2), the court may estimate a claim if it is based on a right to payment arising from the right to an equitable remedy.  The buyer attempted to argue that under

---

[10] The court in *Coppola* reasoned that "[a] seller will not be permitted to profit from his breach of a contract with a buyer, even absent proof of fraud or bad faith, when the breach is followed by a sale of the land to a subsequent purchaser." *Coppola*, 531 So.2d at 335–36.

*Schachter* and *Coppola* it had the right to a constructive trust – an equitable remedy – and therefore a damages claim. *Id.* at 505-506. The *TOUSA* court disagreed. The court reasoned the debtor's breach occurred because the property was being sold as part of the bankruptcy process, not because the debtor sold the property for a higher price. *Id.* at 506. Therefore, the breach resulted from the rejection of the contract, and not from the sale of the property. Ultimately, the court in *TOUSA* recognized that the type of situation which would give rise to the imposition of a constructive trust is quite specific and should be utilized as a limited exception.

The facts of this case simply do not support Omni's argument. Omni essentially seeks to avoid the impact of rejection by making an alternative argument to still receive the benefit of the ROFR – the value of the Property over $3.5 million. To award Omni such relief would be to eviscerate the purpose of rejection under § 365 which is to relieve debtors from a burdensome contract. The Debtors' rejection of the ROFR will benefit the estate by eliminating a burdensome contract. Indeed, the Plan is funded entirely by the proceeds from the sale which would not be available without rejection. Based on the stalking horse contract, unsecured creditors stand to receive $200,000.00 from the sale and this amount will increase as the price increases. The Court finds the Debtors are authorized to reject the ROFR as an executory contract under § 365, and that the Debtors exercised sound business judgment in making the decision.

## II    Adequacy of the Disclosure Statement

"The purpose of the disclosure requirements in §§ 1123 and 1125 is to allow creditors to cast an informed vote for or against a plan of reorganization." *In re M. Davis Mgmt., Inc.*, No. 6:09-BK-02071-KSJ, 2011 WL 3585821, at *10 (Bankr. M.D. Fla. July 19, 2011). At the trial, Omni raised several objections to the adequacy of Debtors' Disclosure Statement. Omni is the only party objecting to the Disclosure Statement. Notably, Omni does not complain about the

clarity of its treatment or how the Plan will be funded, but instead about classification and impairment of other claims – confirmation issues which will be addressed below. Omni's pleadings and arguments at trial demonstrate that it fully understands the terms of Debtors' Plan, but is simply unhappy with those terms. This is not a sufficient basis to object to the Disclosure Statement. The Court finds the Disclosure Statement adequately meets the requirements in §§ 1123 and 1125 and overrules Omni's objection.

### III    The Debtors are Authorized to Sell the Property either under Section 363 or the Plan

The Debtors seek approval to sell the Property under 11 U.S.C. § 363. The Motion to Sell provides that the sale of the Property will be subject to better and higher offers from competitive bidders at an auction to be held by the Debtors. The Debtors' Broker secured an Initial Contract for $5,000,000.00 cash on an "as is" purchase for the sale of the Property.[11] The Initial Contract establishes the opening bid for the auction as proposed in the Debtors' Plan. At trial, the real estate agent, Kassandria Brown, testified that since the Initial Contract was secured, the Broker has continued to market the Property, and in her professional judgment she anticipates there will be approximately five potential buyers, in addition to the stalking horse, bidding on the Property at an auction.

Omni objects to the Motion to Sell primarily on the basis that the Property is exempt homestead property that is not property of the estate and therefore cannot be sold under 11 U.S.C. § 363.[12] In response, the Debtors maintain that they may sell the Property under § 363 because the

---

[11] On October 29, 2021, the Debtors filed a Notice of Filing Stalking Horse Contract for Sale and Purchase of Debtors' Residence in Support of (I) Debtors' Sale Motion (Doc. 16) and (II) Debtors' Plan of Reorganization (127). (Doc. 170).

[12] Specifically, § 363 (b) provides that a trustee or debtor-in-possession "after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Additionally, 11 U.S.C. § 363(f)(4) authorizes a trustee or debtor-in-possession to sell property of the estate "free and clear of any interest in such property" if such interest "is in a bona fide dispute." 11 U.S.C. § 363(f)(4).

estate acquired a minimum post-petition intertest of $100,000.00 in the otherwise exempt Property, and that in any event, a sale under the Plan is permitted.  The Court agrees.

"[A] rule of once in, always in is necessary to discourage strategic, opportunistic behavior that hurts creditors without advancing any legitimate interest of debtors."  *Matter of Lybrook*, 951 F.2d 136, 137 (7th Cir. 1991).  On May 27, 2021, the Debtors filed an Amended Schedule C for the purpose of unconditionally designating $100,000.00 from the sale proceeds of the Property to be distributed to unsecured creditors in their Chapter 11 case, or, in any subsequent proceeding.[13]  The Court finds the estate has an interest in the Property based on the unconditional designation of the $100,000.00 waiver.  *See e.g.*, *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1176 (11th Cir. 2017) (holding that the doctrine of judicial estoppel will apply if a debtor takes a position under oath in a bankruptcy case that is inconsistent with the debtor's subsequent actions and is intended to make a mockery of the judicial system).

The Court rejects Omni's argument that Debtors may not waive a portion of their homestead exemption.  A determination of homestead is based on a debtor's intent.  "The homestead character of a property depends upon an actual intention to reside thereon as a permanent place of residence, coupled with the fact of residence."  *In re Bennett*, 395 B.R. 781, 789 (Bankr. M.D. Fla. 2008) (internal quotations omitted.).  A debtor's intent is key both before and after a sale of homestead.  *See Orange Brevard Plumbing & Heating Co. v. LaCroix* 137 So.2d 201, 206 (Fla. 1962) (holding "the proceeds of a voluntary sale of a homestead to be exempt" so long as the debtor has a good-faith intent to "reinvest the proceeds thereof in another homestead within a reasonable time" and that "only *so*

---

[13] Additionally, the Debtors' Plan provides that for each $500,000.00 increase in the sales price of the Property, above $4,000,000.00, additional distributions in the amount of $50,000.00 are contemplated.  As the Initial Contract for the sale of the Property provides for a sales price of $5,000,000.00, the holders of allowed unsecured claims will receive a pro rata distribution of $200,000.00 under the Plan.  Further, the distribution amount may be greater if the Property is sold for more than $5,000,000.00.

*much* of the proceeds of the sale as are intended to be reinvested in another homestead may be exempt under this holding. Any surplus over and above that amount should be treated as general assets of the debtor."). Debtors' Amended Schedule C is sufficient evidence of Debtors' intent for the Court to determine that Debtors' have partially waived the homestead protection.

Moreover, the Court notes that the Property is now being sold through the Plan making § 363 largely irrelevant to the analysis. Omni does not appear to argue that the Debtors may not sell the Property pursuant to a plan of reorganization. Under § 1123(c), a plan proposed by a non-debtor may not provide for the sale of exempt property unless the debtor consents. If exempt property may not be included without consent of the debtor, the converse must also be true. Here, Debtors have proposed the Plan and consent to the sale. Accordingly, Debtors are authorized to sell the Property.

## IV    Classification of Claims/Gerrymandering

Section 1122(a) of the Bankruptcy Code states that a "plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). The rule principally adhered to is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991), on reh'g (Feb. 27, 1992). "There may be, however, good business reasons to support separate classification." *In re New Midland Plaza Assocs.*, 247 B.R. 877, 893 (Bankr. S.D. Fla. 2000). "The Eleventh Circuit has articulated that a plan proponent has considerable discretion in delineating claims into classes, but such discretion is curtailed if the plan 'unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights.'" *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 253 (Bankr. M.D. Fla. 2006) (citing *Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.),* 913 F.2d 873,

880 (11th Cir. 1990) (citations omitted)).

Omni argues that there is no business justification for the Debtors to separately classify the claims of Berger Singerman (Class 3), the Beams (Class 4), and Omni (Class 6), and that the claims should therefore be classified together with the general unsecured claims in Class 7.[14]   In response, the Debtors maintain that "(1) these creditors each filed proofs of claims asserting a secured status; and (2) the circumstances giving rise to each of these claims were substantially different because each of them presented their own unique set of factual and legal issues."  (Doc. 169, pg. 5).

Debtors further distinguish the claims in that (i) the proof of claim filed by Berger Singerman is based on an attorney's charging lien; (ii) the proof of claim filed by the Beams is based on a mortgage the Debtors granted the Beams as security for a contingent debt arising from a prepetition settlement agreement; and (iii) the proof of claim filed by Omni arises out of Omni's purported ROFR on the Property that is the subject of the State Court Action.[15]

The Court finds that the Debtors have articulated adequate justification for the separate classification, and that the Plan complies with § 1122(a).  In particular, the claims filed by these three creditors were filed as secured claims.  Secured claims generally are not substantially similar to other secured claims and are therefore classified differently.  *See FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. P'ship*, 155 B.R. 93, 99 (D. N.J. 1993).  The claims are substantially different resulting in substantially different treatment under the Plan.

---

[14] The claims of both Berger Singerman and the Beams are treated under the Plan as being partially secured, with the remainder treated as unsecured.

[15]  Omni might have an argument that its claim should be in Class 7 with other general unsecured creditors. The Court's Order Sustaining Objection to Secured Status was issued after the Initial Plan was filed, and treats the claim as unsecured. In any event, the claim is being treated along with Class 7.  The separate classification of Omni's claim will not change the result. Including Omni's claim in Class 7 does not change the vote. Debtors do not have the vote of all impaired classes and must resort to cramdown under § 1129(b).

**V        Settlement of Claims Through the Plan**

Settlement is an ordinary and appropriate part of the confirmation process.  "Bankruptcy Rule 9019(a) allows the Court to approve a compromise or settlement, Fed. R. Bankr.P. 9019(a) (2005), and § 1123(b)(3)(A) of the Code permits a plan to incorporate a settlement." *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 250–51 (Bankr. M.D. Fla. 2006).

The Debtors disputed the claims of Berger Singerman and the Beams.  Therefore, it is reasonable to expect they would engage in negotiations on the disputed secured claims for the purpose of reaching an agreement on the Plan.  It is also appropriate to include those settlements in the Plan. The Court considers Omni's objection to these provisions of the Plan as an objection to those compromises.

In the Eleventh Circuit, bankruptcy courts consider four factors, commonly referred to as the *Justice Oaks* factors, to determine the "fairness, reasonableness and adequacy" of a proposed compromise.  They are:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

"In evaluating the *Justice Oaks* factors, courts generally defer to the trustee's business judgment when reasonable, although the ultimate decision to approve a settlement lies within the court's discretion.  In exercising its discretion, the court seeks to determine whether the settlement, at a minimum, is fair and does "not fall below the lowest point in the range of reasonableness.'" *In re Yormak*, No. 2:15-BK-04241-FMD, 2021 WL 4206436, at *3 (Bankr. M.D. Fla. Sept. 16, 2021) (citations omitted); *see also In re Gaddy*, 851 F. App'x 996, 1000 (11th Cir. 2021) (citing to *Martin v. Pahiakos*, 490 F.3d 1272, 1275 (11th Cir. 2007) (recognizing that the Eleventh Circuit's "review

of a bankruptcy court's application of the *Justice Oaks* factors is quite limited.  We will reverse only when the bankruptcy court approved a compromise that fell 'below the lowest point in the range of reasonableness.'").

The Court finds that the settlements reached are within the range of reasonableness.[16]  The Beams asserted a secured claim based on their prepetition settlement.  That agreement, entered into to settle their disputes in the State Court Action, provided that the Debtors will pay the Beams $1,105,000.00 in the event the Debtors settle with Omni or a court determines that Omni has no right to purchase the Property.  (Omni's Ex. 10).  The agreement also granted the Beams a mortgage on the Property to secure payment.  *Id.*  The Beams, of course, contend that rejection of the Omni ROFR triggers their entitlement to a fully secured claim.  The Court can determine based on the language of the agreement, that the Debtors' settlement, which results in the Beams being paid a secured claim of under half this amount, is within the range of reasonableness.[17]  Similarly, Berger Singerman asserted a claim for prepetition attorney's fees totaling $299,129.48 as a secured claim based on the Debtors' grant of a security interest in the Property as detailed in their engagement agreement.  The Debtors' settlement pays Berger Singerman only $100,000.00 as a secured claim and the remainder as an unsecured claim.  Berger Singerman cites legal authority recognizing the validity of an attorney charging lien.  (Doc. 161).  Omni disputes this authority.  Even if the Debtors have a defense to the

---

[16] "The concept of the 'range of reasonableness' has been defined as a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *In re Pullum*, 598 B.R. 489, 492-93 (Bankr. N.D. Fla. 2019). A court should consider "the probable outcomes of the litigation, including its advantages and disadvantages, and make a pragmatic decision based on all equitable factors." *In re McDowell*, 510 B.R. 660, 663 (Bankr. N.D. Ga. 2014).

[17] Omni asserts that the Beams' mortgage is invalid because of its lis pendens, but this argument falls flat. (Omni's Ex. 22). A lis pendens puts parties on notice of a claim against property. It does not invalidate all subsequent liens on the property. *See In re Rosario*, No. 6:17-BK-03601-RAC, 2017 WL 11569122, at *3 (Bankr. M.D. Fla. Dec. 18, 2017) (recognizing that the recording of a lis pendens "in the public records provides notice of a potential claim against a property but does not itself create a lien.").

treatment of Berger Singerman's claim as secured, the settlement still falls within the range of reasonableness considering the costs and risks of litigation. The settlement amounts to about 33% of its claim being treated as secured.

Omni does not object to the amount of the claims asserted by the Beams and Berger Singerman. Instead, Omni objects to the Plan's treatment of the claims as partially secured and the remainder as unsecured. The Court finds that settlement of these potentially secured claims for less than half of what is asserted, with the remainder paid as an unsecured claim, is within the range of reasonableness and in the best interests of creditors.

## VI    Feasibility Under § 1129(a)(11)

11 U.S.C. § 1129(a)(11) requires the Court to determine that confirmation of the plan of reorganization "is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement "is designed primarily to prevent confirmation of visionary schemes that promise a greater distribution than the debtor or plan proponent could ever attain." *In re JRV Indus., Inc.*, 344 B.R. 679, 683 (Bankr. M.D. Fla. 2006). "The use of the word, likely, requires the Court to assess whether the plan offers a reasonable 'probability of success, rather than a mere possibility.'" *In re Diplomat Constr., Inc.*, 2009 WL 6498180, at *2 (Bankr. N.D. Ga. Nov. 20, 2009) (quoting *In Kent Terminal Corp.*, 166 B.R. 636, 650 (Bankr. S.D.N.Y. 1994)). That is, the proponent must show the plan offers "a reasonable prospect of success and ... is workable." *In re D & G Invs. of W. Florida, Inc.*, 342 B.R. 882, 885 (Bankr. M.D. Fla. 2006). However, "[t]he mere potential for failure of the plan is insufficient to disprove feasibility." *Id.* at 886.

Here, the Debtors have proposed a Plan that is entirely dependent on the proceeds from the

sale of the Property.  Notably, the Debtors have already secured an Initial Contract for $5,000,000.00, which is greater than the $4,000,000.00 sales price initially contemplated under the Plan.  (Doc. 170).  There is also the possibility that the Property will sell for more than $5,000,000.00 at an auction.  At the trial, Debtors' realtor testified that she has received interest from other interested purchasers and that she expects competitive bidding at the sale.  Omni presented no evidence to contradict or rebut this testimony. The Plan offers a reasonable assurance of success as it is to be funded out of a sale for which the Debtors' already have a contract. The Court finds that Debtors' Plan meets the feasibility test under § 1129(a)(11).

## VII    **Cramdown**

Under 11 U.S.C. § 1129(a)(10), to confirm a plan over the objection of an impaired dissenting class, at least one of the class of claims that is impaired must accept the plan. 11 U.S.C. § 1129(a)(10).  "The purpose of § 1129(a)(10) is to provide some indicia of support for a plan of reorganization by affected creditors and prevent confirmation where such support is lacking." *In re All Land Invs., LLC*, 468 B.R. 676, 689 (Bankr. D. Del. 2012) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243-44 (3d Cir. 2004)).

Under the Plan, Class 3 (Berger Singerman), Class 4 (the Beams), and Class 5 (Mr. Walker), are classified as impaired classes that have voted to accept the Plan.  For reasons discussed below, the Court accepts that these claims are properly classified as being impaired.  As the Debtors have the support of at least one class of impaired claims that is impaired, the Plan satisfies § 1129(a)(10).

*Debtors Have Not Artificially Impaired Claims*

Under 11 U.S.C. § 1124, a class of claims is impaired under a plan unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claims or interest." 11 U.S.C. § 1124.  "Artificial" impairment occurs when a plan imposes

an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired under § 1124." *Combustion Eng'g,* 391 F.3d at 243.  Omni argues that the Debtors have artificially impaired the claims of Berger Singerman, the Beams, and Mr. Walker so as to create a class of impaired claims voting in favor of the Plan.  The Court disagrees.[18]

Specifically, the Court rejects Omni's argument that there has been artificial impairment of the Walker claim because Debtors are not paying post-petition interest or fees. Omni contends Debtors have the ability to pay interest and fees.  This is not correct, nor is it the law.  First, the majority of the estate's assets are exempt.  The Debtors are not required to devote exempt assets to pay estate claims.  Further, "a plan which achieves a result consistent with the objectives and purposes of bankruptcy is considered filed in good faith, even when a plan allows a debtor to remain solvent while impeding contractual rights." *In re Reid Park Properties, LLC,* No. 4:11-BK-15267-EWH, 2012 WL 5462919, at *4 (Bankr. D. Ariz. Nov. 7, 2012) (citing *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074–75 (9th Cir. 2002)).

Here, the Plan does not provide for post-petition fees, costs, and interests on Mr. Walker's claim.  Therefore, the claim is properly classified as being impaired under the Plan.  The Court further finds that the secured claims of Berger Singerman and the Beams are properly classified as impaired because the Plan proposes to pay only a fraction of the claims as secured and the remainder as

---

[18] The court in *Combustion Eng'g* noted that courts have reached different conclusions over the issue of artificial impairment.  Some courts have found that under that the plain language of § 1129(a)(10) a debtor is not prohibited from artificially impairing claims. *See, e.g., In re Duval Manor Assocs.,* 191 B.R. 622, 628 (Bankr. E.D. Pa. 1996) (concluding that "artificial impairment, while perhaps philosophically not the better view, is nevertheless clearly permitted under the plain meaning of the statute"); *L & J Anaheim Assocs.,* 995 F.2d 940, 943 (9th Cir. 1993) (holding that § 1124 does not differentiate between artificial and actual impairment of claims).  Conversely, other courts have held "that allowing debtors to manipulate impairment of a class to satisfy § 1129(a)(10) 'so distorts the meaning and purpose of [§ 1129(a)(10)] that to permit it would reduce (a)(10) to a nullity.'" *In re All Land Invs., LLC*, 468 B.R. 676, 690 (Bankr. D. Del. 2012) (quoting *In re Windsor on the River Assocs., 7* F.3d 127, 131 (8th Cir. 1993)).  Because the Court finds that the Debtors' Plan does not artificially impair claims, the Court will not engage in an analysis on this issue.

unsecured. This is the very essence of impairment. The Court finds the Debtors have properly classified the claims as being impaired under the Plan.

*The Plan Does Not Violate the Absolute Priority Rule*

Under § 1129(b)(1), for a plan to be confirmed over a rejection by an impaired class of unsecured claims, the plan must be "fair and equitable," to each non-accepting impaired class of claims. 11 U.S.C. § 1129(b)(1). "For a plan to be found 'fair and equitable,' it must, if unsecured claims are not to be paid in full, satisfy the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii)." *In re Steedley*, No. 09-50654, 2010 WL 3528599, at *1 (Bankr. S.D. Ga. Aug. 27, 2010).

As an initial matter, the Court sides with the majority and holds that the absolute priority rule applies to individual Chapter 11 debtors. *See In re Martin*, 497 B.R. 349, 357 (Bankr. M.D. Fla. 2013). Section 1129(b)(2)(B)(ii) requires that, for a class of unsecured creditors:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Omni maintains that the Debtors' Plan violates the absolute priority rule because the Debtors will retain a portion of the proceeds from the sale of their homestead Property and are therefore not contributing all their property to the estate. Conversely, the Debtors maintain that they are permitted to retain their exempt property under the absolute priority rule. *See Martin*, 497 B.R. at 352; *In re Henderson*, 321 B.R. 550, 552 (Bankr. M.D. Fla. 2005), aff'd, 341 B.R. 783 (M.D. Fla. 2006).

In *Martin*, Judge Williamson recognized that although some courts have held that the retention of exempt property violates the absolute priority rule, "the majority (and better reasoned) decisions disagree, concluding that the total liquidation of an individual Chapter 11 debtor's assets is not required in order to satisfy the absolute priority rule." *Martin*, 497 B.R. at 352. In reaching this

conclusion, the court stated:

> As Judge Paskay reasoned when considering this issue in Henderson, a debtor's interest in exempt property can never be "junior" to the interests of creditors (including claims of dissenting unsecured creditors) because unsecured creditors cannot reach exempt property outside of bankruptcy, and exempt property is immune and not subject to liquidation under any of the chapters of the Bankruptcy Code.12 This conclusion is consistent with the underlying rationale for the absolute priority rule—namely, that an owner's interest in property is subordinate to the interests of the owner's creditors—subject to the long-recognized exception to this subordination with respect to exempt property as reflected in various provisions of state and federal law.

*Martin*, 497 B.R. at 352–53.

This Court agrees with this well-reasoned analysis and with the conclusions reached by the courts in *Martin* and *Henderson* which represent the majority view.  Therefore, the Court finds Debtors are not in violation of the absolute priority rule, as they are not required to devote all the proceeds from their exempt homestead Property under the terms of the Plan.  The Plan otherwise complies with the absolute priority rule that individual debtors devote all non-exempt property (except for earnings from post-petition services).

### VIII    Good Faith Analysis

Omni asserts that the Plan should not be confirmed and the stay lifted because of Debtors bad faith.  Essentially, Omni argues that the case was filed to reject the ROFR and the Debtors' plan primarily benefits the Debtors and not the estate.  Omni maintains that bad faith is demonstrated by the following circumstances: (i) the Debtors' petition was filed on the eve of a hearing in the State Court Action on Summary Judgment Motions, (ii) the Debtors will receive a majority of the net proceeds from a sale of the Property, and (iii) the Debtors' attempted to classify the case as a Subchapter V even though Debtors have no business.  The Court disagrees and finds that the Debtors filed the case and the Plan in good faith.

In support of the allegation that the Debtors filed the case in bad faith, Omni looks to the

factors set forth by the Eleventh Circuit in *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir. 1988).[19]   Although relevant to the bad faith analysis, the Court recognizes that these factors are guideposts rather than a rigid standard for determining bad faith.   *In re Stafford Rhodes, LLC*, 2012 WL 5439041 at *3 (M.D. Ga. Nov. 7, 2012).   A court has broad discretion to evaluate the totality of the circumstances in each case and to determine whether those circumstances indicate a petition was filed in bad faith.   *See Singer Furniture Acquisition Corp. v. SSMC Inc., N.V.* (*In re Singer Furniture Acquisition Corp.)*, 254 B.R. 46, 51 (M.D. Fla. 2000); *In re Balboa St. Beach Club, Inc.*, 319 B.R. 736, 740 (Bankr. S.D. Fla. 2005) ("So in deciding a motion to dismiss for having been filed in bad faith, the [c]ourt must decide it on a case by case basis.").

Specifically, Omni maintains that the case of *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) has similarities to the Debtors' case.   In *Waldron*, the Eleventh Circuit had to determine whether the debtors, who filed their Chapter 13 petition solely to reject an option agreement with Shell Oil, filed the case in good faith.   Upon review, the Eleventh Circuit found that the Waldrons were not financially distressed and had no real need for the bankruptcy process.   In finding that the bankruptcy court should not have confirmed the Waldrons' plan, the court stated that "[t]he Waldrons only motive was to enhance their financial coffers by manipulating and abusing the bankruptcy process." *Waldron*, 785 F.2d at 940-941.   The court also reasoned that "Congress could not have intended that the debt-free, financially secure Waldrons be permitted to engage the bankruptcy machinery solely to

---

[19] The circumstantial factors identified in *Phoenix Piccadilly* as evidence of a bad faith filing include the following: (i) the debtor has only one asset in which it does not hold legal title; (ii) the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors; (iii) the debtor has few employees; (iv) the property is the subject of a foreclosure action as a result of arrearages on the debt; (v) the debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in a pending state court action; and (vi) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.   *Phoenix Piccadilly*, 849 F.2d at 1394.

avoid an enforceable option contract."[20]  *Id.* at 941.

Notably, the Eleventh Circuit drew an important distinction between the cases that the bankruptcy court relied upon, which held that it is not an abuse of the bankruptcy process to file a petition under Chapter 7 or 11 solely to reject an executory contract, and the facts of the Waldrons' case.  The Eleventh Circuit distinguished those cases because "rejection was permitted to serve the intended purpose of Chapter 11 – to facilitate the adjustment of debts through reorganization."  *Id.*; *see also Bildisco*, 104 S.Ct. at 1197 ("[s]ince the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action").  In dismissing the Waldrons' petition, the court found that the rejection of the option contract would not serve the policy of successful rehabilitation:

> In this case, rejection of the option agreement with Shell Oil would serve no such policy or purpose. The Waldrons have no debts; they are financially secure. In fact, their liquid assets will be increased by $40,000 when Shell Oil exercises its option to purchase the land at 2727 West Flagler Street.  The Waldrons' plan was thus proposed in a bad faith attempt to use and abuse Chapter 13 for a greedy and unworthy purpose. Congress could not have intended such a result in enacting Chapter 13. Permitting the financially secure Waldrons to avoid the option agreement with Shell Oil would prompt a flood of litigation: any business that proves it miscalculated could avoid unprofitable deals through the bankruptcy process. This result makes a travesty of the bankruptcy process. The Waldrons' petition must be dismissed.

*Waldron*, 785 F.2d at 940–41.

The court in *Waldron* concluded by stating, "whenever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and

---

[20] "The bankruptcy laws were simply not intended to be used as a sword by the rapacious*." Waldron*, 785 F.2d at 940.

question the debtor's motives.  If the court discovers unmistakable manifestations of bad faith, as we do here, confirmation must be denied."[21]  *Id.* at 941.

The Debtors argue that unlike the debtors in *Waldron*, they are not financially secure and have substantial debt which they seek to reorganize.  In support of their position, the Debtors cite to the case of *In re Wells*, 227 B.R. 553 (Bankr. M.D. Fla. 1998).  In *Wells*, the debtor in possession filed a case under Chapter 11 solely to reject a burdensome executory contract with a purchaser of real property.  The court in *Wells* found that "the power to reject executory contracts is implicit in the Code, and absent other factors, bad faith will not be implied solely because a debtor files in an attempt to reject a financially burdensome contract."[22]  *Id.* at 562.

Notably, Judge Proctor stated that the traditional bad faith analysis involved single party disputes between debtors and their secured lenders which could ordinarily be resolved in a pending mortgage foreclosure action.  *Id.*  The purchaser in *Wells*, however, was *not* a secured creditor as he possessed no mortgage or security interest in the property.[23]  The court in *Wells* further noted that the facts of that case were indicative of several bad faith factors, including that the debtors were not financially distressed, had very speculative creditors and were not having difficulty in meeting their financial obligations.[24]  *Id.* at 563.

---

[21] "Unmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud.  We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse."  *Waldron*, 785 F.2d at 941.

[22] Typically, filing a bankruptcy case for the purpose of rejecting an executory contract is not considered in itself bad faith. *See, e.g.*, *Balboa*, 319 B.R. at 740 (collecting cases and noting: "there is no such thing as 'bad faith' in bringing a bankruptcy case solely for the purposes of rejecting an overly burdensome executory contract"); *In re Chameleon Systems, Inc.*, 306 B.R. 666, 696 (Bankr. N.D. Cal. 2004) ("rejection and the capping of a landlord's claim is not per se bad faith").

[23] *See also*, *Balboa*, 319 B.R. at 741 (recognizing the case was distinguishable from single asset real estate cases traditionally dismissed for having been filed in bad faith based on the "critical distinction" that "the fundamental dispute driving [the] case [was] not with a secured lender looking to foreclose upon a piece of property lacking equity on the eve of foreclosure but, [was] rather with a rejection of an executory contract.).

[24] *See Spoverlook*, 560 B.R. at 364–65 (Bankr. D. N.M. 2016).  In holding that the debtor was not acting in bad faith by filing the case for the sole purpose of rejecting the settlement agreement (which the Court ruled was an executory

After conducting a full day trial, which included extensive legal argument, the Court finds no "unmistakable manifestations of bad faith." The Debtors decided to file for bankruptcy after engaging in years of contentious litigation.[25] Ultimately, this resulted in the Debtors incurring a large legal bill and other debts they were unable to pay without the Property.[26] Mr. Schroeder testified that the bankruptcy was filed to reorganize their debts. The Court accepts this testimony. When this case was filed, the Debtors were facing legal fees and claims of approximately $4,500,000.00 in secured debts and $575,000.00 in unsecured debts. (Doc. 1). The Court finds that Debtors' filing and rejection of the ROFR was not made in bad faith even if rejection was the primary purpose because such rejection serves the intended purpose of chapter 11.

### IX   Motion to Allow Omni and AIPRE Claims for Voting Purposes Under Bankruptcy Rule 3018(a)

The Court finds that the claims of Omni (Claim No. 6) and AIPRE (Claim No. 5) should be allowed in their full amounts for voting purposes. However, the allowance of the claims does not impact confirmation. As already discussed, the Debtors' Plan satisfies the cramdown provision of 11 U.S.C. §1129(b).

---

contract) the court stated: "if filing a bankruptcy petition after entry of an adverse state court ruling automatically constitutes bad faith, many cases would have to be dismissed. Consumer debtors regularly file bankruptcy petitions after the entry of foreclosure judgments. Retailers and restaurateurs file petitions after litigation with vendors, landlords, franchisors, etc. By approving rejection, the Court is not disturbing or collaterally attacking a pre-petition state court judgment …"

[25] The Court rejects Omni's argument that the Debtors' decision to initially file the case as a small business case under Subchapter V of Chapter 11 is indicative of bad faith. The Small Business Reorganization Act ("SBRA") was enacted on August 23, 2019 and became effective on February 19, 2020. The purpose of Subchapter V is to provide "small business debtors a new streamlined process to reorganize outside of the more costly traditional Chapter 11." *In re Vertical Mac Constr., LLC*, No. 6:21-BK-01520-LVV, 2021 WL 3668037, at *1 (Bankr. M.D. Fla. July 23, 2021). Since Subchapter V went into effect, the issue of whether a debtor is eligible to proceed under Subchapter V has been the subject of much debate, and the Court just recently had the opportunity to address the issue in the case of *Vertical Mac*. As issues arising under Subchapter V are a relatively new and evolving area of the law, the Court does not find the Debtors' initial decision to file their case as a Subchapter V, on advice of counsel, to be indicative of bad faith.

[26] Curiously, Omni cites to the Debtors' lack of income and liquid assets in regards to feasibility, but then argues there was no legitimate basis for seeking reorganization. Both cannot be true.

## X        Motion for Leave to Object

Shortly before trial, Omni filed its Motion for Leave to Object to Claims seeking permission to object to the claims of Berger Singerman, the Beams, and Mr. Walker.  The Court finds that Omni does not need leave to object to claims.  As a creditor and therefore a party in interest, Omni has standing to object to the claims.  *See* 11 U.S.C. § 502(a).  In fact, Omni has already filed objections to these claims.  (Docs. 149, 150, 151).  While the extent to which Omni holds a claim remains at issue, the Court still considers Omni a party in interest.[27]  Nevertheless, once a debtor settles a claim and creditors are allowed to object, the Court should not hear further objections by those creditors on the same grounds. The Court treats the request to object as an objection to the compromises reached in the Plan. *See Winn-Dixie Stores*, 356 B.R. at 250–51 ("Bankruptcy Rule 9019(a) allows the Court to approve a compromise or settlement, Fed. R. Bankr.P. 9019(a) (2005), and § 1123(b)(3)(A) of the Code permits a plan to incorporate a settlement.").

As stated above, the Court finds that the compromises are within the range of reasonableness and therefore, Omni's objections are overruled.  A party in interest may ask for reconsideration as to a claim at any time, but will need to establish why the Court should reconsider its ruling.  See 11 U.S.C. § 3008.  The Motion will be denied.

### Conclusion

Omni complains that the Debtors' Plan will result in a windfall to Debtors and primarily benefits insiders.  In lieu of confirming the Plan, Omni asks this Court to instead grant relief from the stay to compel the Debtors to sell the Property to Omni for $3,500,000.00.  Under the Plan, if the Court assumes the Property is sold for $9,000,000.00, which is less than the stipulated value, secured creditors will be paid in full and unsecured creditors will receive $600,000.00. Debtors, as Omni

---

[27] Debtor's Second Objection to Claim Number 6 filed by Omni.  (Doc. 128).

points out, will receive proceeds of approximately $5,000,000.00 but this value comes from Debtors' exempt homestead.  Debtors cannot receive a windfall from the value of their own exempt property – property they are under no obligation to devote to creditors.  Alternatively, if the Court rejected the Plan and granted Omni stay relief, Omni would receive property worth over $5,500,000.00 more than what it will pay – truly a windfall – while creditors other than Regions Bank and the Nassau County Tax Collector would receive nothing.  It is hard to imagine a worse result for the estate's creditors.

For the reasons discussed, the Court finds the Debtors' Plan meets all the requirements for confirmation under 11 U.S.C. § 1129(b). The Debtors are directed to submit an order confirming the Plan. The Court will enter separate orders consistent with this opinion on the remaining matters.

Attorney Jason A. Burgess is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of its entry.